**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
: 
HUDSON DOUBLE,                                  :     Case No. 7:25-cv-10512 (PMH)
:
    *Plaintiff,*                        :
:     **JURY TRIAL DEMANDED**
  -against-                              :
:
:
VASSAR COLLEGE,                                :
:
    *Defendant.*                       :
:
---------------------------------------------------------------X

## AMENDED COMPLAINT

Plaintiff Hudson Double ("Plaintiff"), by and through his counsel, Hamilton Clarke, LLP, as for his Amended Complaint against Defendant Vassar College ("Vassar," or "Defendant"), alleges as follows:

### INTRODUCTION

Vassar College improperly used, *and continues to use*, its Title IX process as a weapon to retaliatorily punish and silence the wrong student, Plaintiff, and to deter others from saying anything reputationally damaging, even if true, about the child of a Vassar faculty member.

Plaintiff spoke up after learning that Sebastian Woods-DeLeon, an adult student attending Vassar, had engaged in sexual touching of a sixteen-year-old student who was legally incapable of consenting to such conduct under New York law. When that minor came forward with allegations concerning Woods-DeLeon's conduct, Vassar affirmatively decided not to notify the police, and did not initially pursue the matter under Title IX. For a significant period of time, Vassar declined to treat the minor student's report as a Title IX case.

1

Everything changed when Woods-DeLeon complained about the "rumors" circulating around campus regarding his conduct with the minor. Not coincidentally, Woods-DeLeon is the son of a Vassar professor with professional and personal ties to Vassar's Title IX Coordinator and institutional connections to Title IX-related programs. When Woods-DeLeon complained not of sex-based discrimination, but of reputational harm arising from campus discussion of his conduct with the minor, Vassar abruptly mobilized its Title IX machinery against Plaintiff.

In doing so, Vassar elevated a faculty member's son's reputational concerns into a Title IX enforcement action, while earlier declining to pursue the minor's actionable allegations within that same framework. As a matter of law and policy, Title IX was not used here to address discrimination on the basis of sex, which is its jurisdictional mandate. It was used to protect the reputation of a faculty member's child and to discipline Plaintiff for speaking out.

After a full Title IX hearing, Vassar found Plaintiff not responsible for any Title IX sexual harassment or sex-based misconduct and credited that his statements were motivated by safety considerations and were not knowingly false. That determination confirmed that Plaintiff's speech did not violate Title IX. Nevertheless, having failed to sustain any Title IX violation, Vassar imposed discipline under a broad internal "Disruptive Conduct" provision based on the same speech and underlying facts. In other words, once the Title IX theory failed, Vassar shifted to relying on a catchall conduct rule to reach the same result and sanction the same speech. That sequence confirms the adverse action was not undertaken to remedy sex-based harassment, but to punish Plaintiff for speaking publicly about sexual misconduct.

As Plaintiff repeatedly advised Vassar's General Counsel before being left with no alternative but to file this action to protect and enforce his rights, Title IX was never intended to operate in this manner. It cannot lawfully be wielded as an institutional shield for the children of faculty members at the expense of student rights and institutional integrity. This action therefore

challenges Vassar's retaliatory and conflicted misuse of Title IX, its subsequent reliance on an overbroad internal conduct provision to accomplish the same retaliatory objective, its breaches of its own policies and contractual obligations, and the substantial harm inflicted on Plaintiff's education, mental health, physical health, and standing within the campus community.

## JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

3. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the events giving rise to the claims occurred within this District, specifically, in Poughkeepsie, New York.

## PARTIES

5. Plaintiff Hudson Double is a 20-year-old undergraduate student in his third year at Vassar College, majoring in Science, Technology and Society. He is a citizen and resident of Virginia.

6. Defendant Vassar College is a private, coeducational, not-for-profit liberal arts college with its principal place of business in Poughkeepsie, New York.

7. Vassar College receives federal financial assistance and is subject to Title IX.

## FACTUAL BACKGROUND

### A. The "Latin Night" Incident Giving Rise to Plaintiff's Safety Concerns.

8. In the fall of 2024, Sebastian Woods-DeLeon was in the first semester of his

3

freshman year at Vassar.

9.     On the evening of November 23, 2024, Woods-DeLeon attended a college function called "Latin Night."  Before attending, he "pre-gamed" with friends, consumed alcohol, and went to Latin Night "a little bit buzzed."

10.     At the event, Woods-DeLeon saw Jane Doe, another first-year student in his history class.[1]

11.     At the time, Jane was 16 years old.

12.     They had spoken a few times before and Woods-DeLeon thought she was attractive.

13.     Woods-DeLeon approached her, and as they started talking, invited her to go outside. Jane agreed.

14.     Outside, they continued talking, and, to "cover [his] awkwardness," Woods-DeLeon told Jane he was drunk, even though he later claimed to be "sober" at the time.

15.     After talking more outside and "to be flirtatious," Woods-DeLeon decided to make a move on Jane.

16.     Upon information and belief, Woods-DeLeon placed his hand on and gripped Jane's thigh. With his hand on her leg, Woods-DeLeon asked her if she wanted to make out and attempted to kiss her.

17.     Jane rejected his advances and told him she was 16 years old and not interested.

18.     Jane did not, and as a minor legally could not, consent to Woods-DeLeon, an adult, touching and attempting to kiss her in such a manner.

19.     During this encounter, Woods-DeLeon himself recalled that Jane told him, "You're drunk, and I haven't had my first kiss yet, and I don't want it to be like this."

20.     Woods-DeLeon eventually backed off and they parted ways.

---

[1] "Jane Doe" and "Jane Doe II" refer to two different students. These pseudonyms are used to protect their identities.

21.    On December 7, 2024, approximately a week and a half after the incident, Woods-DeLeon saw Jane at a campus event.

22.    He approached Jane to apologize, as he claimed, "not necessarily because I thought I did anything wrong. I just have never had someone decline to kiss me before, especially not in that context." He continued, "Since I was embarrassed that she had declined a kiss, I told her that I was really drunk that night, I don't remember a lot, even though at the time of our interaction, like I said, I was sober."

23.    Woods-DeLeon later recounted to another student that he "was a little bit drunk" that evening.

**B. Jane Doe's Ongoing Safety Concerns After the Incident and Establishing a Support System Involving Plaintiff.**

24.    Woods-DeLeon's nonconsensual, sexual touching of a 16-year-old minor and attempting to kiss her was conduct reasonably understood as third-degree sexual abuse, forcible touching, and endangering the welfare of a child under the New York Penal Law.

25.    Upon information and belief, Woods-DeLeon had gripped Jane's thigh so hard that Jane discovered bruising on her thigh the next morning. In the days following, she felt sick, anxious, and unsafe on campus. In the months following, Jane continued to struggle, hiding in her room, and avoiding the dining hall for fear of seeing or running into Woods-DeLeon.

26.    On the day following Latin Night, Jane told her close friend, Julia Haggerty-DeGiorgis, that "something happened" to her. Within a week, Jane told Julia the full account of what Woods-DeLeon did to her that night.

27.    In December of 2024, Julia began dating Plaintiff and introduced him to Jane.

28.    For many months, Julia supported Jane when she was having a hard time coping. Julia would be there for Jane when she was crying and talking to her about it. And sometimes Jane

called Julia at night when Julia was with Plaintiff, who, in turn, began to learn what happened.

29.    Over time, as Jane came to trust Plaintiff, and with Jane's permission, Julia told Plaintiff what she understood Woods-DeLeon did to Jane.

30.    As their friendship grew, Jane shared with Plaintiff the emotional toll the incident had taken on her, including her fear of walking alone, avoiding campus spaces, and anxiety about encountering Woods-DeLeon.

31.    In the months that followed, Plaintiff and Julia became part of Jane's support system, helping her manage the fear and hypervigilance she experienced after the incident. Jane did not feel safe on Vassar's campus.  On several occasions, Jane asked Plaintiff and others to accompany her when she felt unsafe outside, especially at night or other times when she felt vulnerable to possible retaliation or further harm by Woods-DeLeon.

32.    Based on months of closely supporting her, seeing her distress firsthand, and learning about Woods-DeLeon's conduct toward at least one other female student, Plaintiff reasonably credited Jane's disclosures.

### C.  *Vassar Disregards Reports of Sexual Assault Against Jane Doe*

33.    Upon information and belief, in December 2024, an anonymous report was filed with Vassar's Title IX Office on Jane Doe's behalf regarding Woods-DeLeon's conduct toward her. Upon information and belief, Vassar did not act on that report.

34.    Upon information and belief, early in the Spring Semester of the 2024/2025 academic year, Jane was still trying to get Vassar's Title IX Office to act on her report. At that time, the Assistant Vice President (AVP) for Institutional Equity and Title IX Coordinator, Belinda Guthrie, who upon information and belief maintains a close professional and personal relationship with Woods-DeLeon's mother, a Vassar professor, affirmatively made the decision not to contact law enforcement on Jane's behalf and failed to pursue Jane's Title IX complaint against Woods-

DeLeon.

35.    Despite receiving these reports, the Title IX Office took no meaningful steps to investigate Jane's allegations. Upon information and belief, Vassar did not initiate a formal investigation into Jane's case until nearly a year later in October 2025, and, as outlined below, only well after Woods-DeLeon initiated Title IX complaints against Jane Doe and Plaintiff for warning fellow students about Woods-DeLeon's conduct toward Jane and others.

### D. Plaintiff Learns That Woods-DeLeon Engaged in Sexualized Touching of a Separate Student and Warns Others.

36.    After supporting Jane, Plaintiff learned about another incident on campus involving a different student. In that other incident, Woods-DeLeon was at a party with Jane Doe II.  Upon information and belief, during the course of that party, Woods-DeLeon became overly touchy and began grabbing her buttocks. Jane Doe II did not consent to Woods-DeLeon's touching.

37.    Learning of more than one student reporting boundary-crossing behavior by Woods-DeLeon, Plaintiff became increasingly concerned about Woods-DeLeon and the safety of minors, young women, and all students on campus. Plaintiff wanted to be proactive about making other students aware, explaining, "everybody should know when there's someone who's potentially violating boundaries that they need to be careful about being around."

38.    Plaintiff later learned that Woods-DeLeon performed as a drummer in a band with Plaintiff's acquaintance from high school who now also attended Vassar.

39.    Plaintiff texted his high school friend: "Hey man, I meant to send this sooner but I noticed you made a post with a guy named Sebastian [Woods-DeLeon]. I don't know the guy myself but he assaulted someone I know and I suspect others as well. I just thought you should know that."

40.    Plaintiff's high school friend responded that Jane Doe should file a complaint with

Vassar's Title IX office and get the help that she needs.

41.     Plaintiff texted back: "the girl that I know personally is already having sessions with SAVP," and that because [Plaintiff's high school friend] and Woods-DeLeon played music together, "it's kinda important to keep an eye on him around your friends and stuff. Appreciate you man. There's at least one other as well, possibly more but we're not sure."

42.     In the spring of 2025, Plaintiff saw anonymous posts on "Fizz" discussing misconduct by Woods-DeLeon, referring to Woods-DeLeon by his initials.

43.     Fizz is a social media platform exclusive to Vassar students. Users can post messages anonymously and posts are only visible to the Vassar campus community.

44.     On April 18, 2025, after Woods-DeLeon's band performed on campus, Plaintiff posted anonymously on Fizz: "The drummer in that band earlier has SAed multiple people, the one playing Bulls on Parade."  In context, "SAed" meant "sexually assaulted."

45.     Plaintiff also later posted on Fizz, in response to posts by other students discussing sexual assault: "asking for a direct play by play of somebody's assaults puts the victim at risk of retaliation from an individual who had previously taken physical action against them."

46.     Plaintiff believed his statements were true or as accurate as they could be.

47.     Plaintiff posted this message to alert other students to protect their personal safety and those of their friends and based on his understanding that Woods-DeLeon had engaged in repeated boundary-crossing behavior, including unwanted touching and coercive communication.

48.     Plaintiff's purpose in making that Fizz post *was not* to malign, defame, or "cancel" Woods-DeLeon.  To the contrary, Plaintiff wanted to warn other students that they need to be extra cautious when they go out or when they go to these parties where, again, "there's someone who's potentially violating boundaries that they need to be careful about being around." It was important to Plaintiff to see that his community was "safe, safer, or more informed."

8

***E.  After Compromised, Pre-Complaint Meetings, Vassar Takes Retaliatory Action Against Plaintiff, Citing His Speech-Conduct By Subjecting Him to a Title IX Investigation and Disciplinary Process.***

49.     Upon information and belief, after seeing Fizz posts he believed referred to him, Woods-DeLeon sought help from his mother, Professor Eva Woods Peiró, Vassar Professor of Hispanic Studies and Director of Media Studies, a long-serving faculty member.

50.     Upon information and belief, Professor Woods has been at Vassar since approximately 2000 and previously held significant roles within the Support Advocacy and Violence Prevention (SAVP) program (formerly "SART"), including providing Title IX-related trainings, serving as a 24-hour advocate, and serving on the SAVP/SART steering committee.

51.     Upon information and belief, drawing on her longstanding relationships and institutional knowledge, Professor Woods steered her son through Vassar's administrative channels and engaged informally with Vassar administrators about the "rumors" circulating around campus regarding her son and his conduct with a 16-year-old minor.

52.     Upon information and belief, this included private meetings with senior Vassar administrators, including Dean Luis Inoa, Institutional Equity and Title VI Coordinator, Brian Van Brunt, and AVP Guthrie. Professor Woods's and Woods-DeLeon's informal outreach occurred before any formal Title IX complaint existed.

53.     Upon information and belief, Professor Woods also leveraged her institutional ties to engage AVP Guthrie's early involvement in the framing of her son's case.

54.     AVP Guthrie has been Vassar's Title IX coordinator since 2021 and previously held other positions, such as Associate Dean of Vassar, dating back to the late 1990s.

55.     As Title IX coordinator, AVP Guthrie oversees Vassar's compliance with federal and state civil rights laws, manages the Title IX Office, and exercises broad discretionary authority over every stage of the Title IX process.

56.     Under Vassar's policies, the AVP is the primary point of contact for receiving notice and complaints, leads the Title IX team, and determines whether complaints come within Title IX jurisdiction.

57.     The AVP has discretion to initiate Vassar-driven investigations even without a complainant. The AVP also has discretion to decide whether complaints proceed or are dismissed, appoint external decision-makers, shape the investigative record, manage party communications, and determine whether privileged or confidential materials become part of a Title IX case file.

58.     Through this role, the AVP functions as the gatekeeper, initiator, and coordinator of Vassar's Title IX enforcement system, and must act independently and free from bias or conflicts of interest.

### F. Vassar's Title IX Action Against Plaintiff Was Infected by Bias and Conflicts of Interest Favoring the Son of a Longstanding Professor.

59.     Whereas Vassar took no meaningful action on Jane Doe's reports for a significant period of time, it immediately held strategy meetings, mobilized institutional resources, and initiated investigative searches once Professor Woods and Woods-DeLeon complained about online statements and "rumors" regarding Woods-DeLeon's conduct.

60.     On May 13, 2025, AVP Guthrie convened a virtual strategy meeting with Woods-DeLeon and both of his parents, despite Vassar's policy limiting a party to a single support person.

61.     The meeting, with recorded minutes, reflected longstanding familiarity. AVP Guthrie and Professor Woods addressed each other on a first-name basis—"Eva" and "Belinda"—and spoke as institutional peers, even discussing Professor Woods' travel to Spain, rather than as a neutral administrator and parent of a potential party.

**Belinda Guthrie:**

I understand that it can be hard for parents, when Sebastian's here, and Eva, I don't know if I know how long you're still in Spain, but the distance can be hard. Are you coming back this summer?

**EW (Mother):**

Yes, I'll be teaching all next year and chairing or directing. But I just want to thank you so much, Belinda. You've been fantastic. Thank you for, you've been just very attentive and been helpful, so thank you. Thank you.

62.     During this meeting, which occurred before any Title IX complaint had been filed, AVP Guthrie engaged in investigative conduct, soliciting witness names, asking Woods-DeLeon to identify students, inquiring into the sources of various posts online, and offering to search Vassar systems to help Woods-DeLeon identify Plaintiff.

63.     AVP Guthrie repeatedly asked Woods-DeLeon and Professor Woods what "actions" they wanted Vassar to pursue on behalf of Woods-DeLeon, discussed potential charges, and offered to send photos to Woods-DeLeon to confirm and identify Plaintiff. AVP Guthrie's statements reflected coordinated planning on behalf of Woods-DeLeon rather than neutral guidance about institutional processes.

64.     Minutes from this meeting showed that Professor Eva Woods ("EW") advanced the agenda, even as Woods-DeLeon ("SWD") expressed ambivalence about proceeding with a full Title IX prosecution.[2]

---

[2] Selected text in the Amended Complaint has been reproduced directly from the minutes of the Title IX investigative report furnished to the parties.

11

**SWD:**

I agree with you. I want this to be over, man. This shouldn't have happened. Honestly, this is not who I am. Sorry, I'm kind of speaking out of emotion right now. I'm really tired and sick of this. But yeah.

**Belinda Guthrie:**

You don't need to apologize. These feelings are yours and you're responding in the best way that you can in this moment. So please don't feel like you need to apologize.

**EW (Mother):**

If I may, one question, just going back to the subpoena, because that was sort of the golden ticket to finding who these people were, and we did not have luck when we went through the police and also lawyers. That's very problematic as you know.

I'm wondering, do you think it's worth just me trying to have a conversation with, I don't know if it's Arlene or Betsy or someone, about when does Vassar try to subpoena Fizz? Because Vassar actually does have the weight. I know this is a bit of a separate issue. I mean, I do think, you should go after try to get to the bottom of this issue with Hudson. I do think that your dad is right about that, and I don't know if it should. I mean, it could be right away. You could start it tomorrow. What could hurt a conversation with Hudson? I mean, clearly if I don't know why Naya would give you that kind of false information about Hudson or whoever it was.

65.     Professor Woods pressed for institutional intervention to pursue what she herself described as "problematic defamation." *Not sex-based discrimination under Title IX.*

**EW (Mother):**

But just mean, do you think it's worth me reaching out to Betsy to see, is there any other kind of action that Vassar could take, which would obviously benefit many more students in the future too, if Vassar could somehow have an agreement that when they spotted problematic defamation online, that they could find out who it is or something? I don't know.

66.     AVP Guthrie indicated her intention to invoke the Title IX process against Plaintiff not to address or enforce claims of sex-based discrimination, but because she wanted "the rumors to stop" with respect to Professor Woods' son.

**Belinda Guthrie:**

And Sebastian, and I want to make sure that we're following your lead. I want the rumors to stop, and if we are able to do this through an informal resolution process that doesn't, as your father pointed out, doesn't further escalate this, that is certainly a desired outcome. If it does not reach in that type of a satisfactory outcome for you, then there is the formal process, and we can do that. Investigation would be carried out into your claims against ██████ and Hudson, following the investigation College policy charges would be filed and an administrative hearing would take place. At this point, we have two names. The other student who you identified, who's the student exec on SMU and Hudson. Do you get the sense from what you've heard, that she, the student exec, is spreading rumors or was she just a reporter of what she heard?

67.     Further, at the behest of Woods-DeLeon's family, AVP Guthrie reported that she

12

had scheduled a meeting with Vassar's General Counsel, Shay Humphrey, to explore "additional measures" Vassar could take against Fizz to stop the "rumors," including subpoenas. These steps are nowhere authorized under Vassar's Title IX intake procedures.



Belinda Guthrie:
So in about an hour, I'm scheduled to speak with Dean Inoa and Shay Humphrey, who's our general counsel about this matter, to see if there are additional measures that the College can take with respect to the Fizz and the administrator because we can continue to make requests each time we're made aware of the posts going up, asking them to be removed and see if they will disclose the identity of the

VASSAR | OFFICE FOR INSTITUTIONAL EQUITY

SWDHD Evidence 000065

anonymous poster. What I will do is after I've had a chance to speak with Ms. Humphrey, Sebastian, I'll let you know the outcome of that conversation.

68.    Woods-DeLeon's parents dominated the meeting, asking whether they should "attack this piece by piece," identifying students they wished Vassar to go after, and urged the immediate and simultaneous commencement of Title IX proceedings. AVP Guthrie accepted these directives.

69.    Throughout the meeting, the conversation focused solely on Woods-DeLeon's reputation and stopping online comments about Woods-DeLeon. No one, including AVP Guthrie, ever asserted that the posts targeted Woods-DeLeon *because of his sex*, as required for Title IX jurisdiction. Indeed, at no point did Woods-DeLeon allege that Plaintiff targeted him because he is male, or that the posts would not have been made if Woods-DeLeon were female, or any other gender. AVP Guthrie accepted the parents' framing that this case was about "rumors" and "attacks" on their son's reputation. *Not sexual harassment or discrimination*.

70.    AVP Guthrie assured Woods-DeLeon that if he pursued a formal complaint, Vassar would be "required" to determine the truth of Woods-DeLeon's and Jane's claims but that the

process was "not designed intentionally just to bring charges against you." AVP Guthrie stated:

> If at any point, the informal resolution process is unsuccessful, you still have the option available to you of a formal complaint. You can also move forward now with the formal complaint.
>
> I believe that Dr. Van Brunt shared with you that part of that formal complaint process, we would be required to sort of explore the underlying incident to determine if what you alleged based on the evidence is true, and if she's alleging that something different happened is true, but that process is not designed intentionally just to bring charges against you. We would be obligated to look into both your claims and her claims. Does that make sense and align what you took away from your conversation with Dr. Van Brunt and from our previous conversations?
>
> SWD:
>
> Yeah. Yeah, that does makes sense.

71.     AVP Guthrie operated on the presumption that the allegations concerning Woods-DeLeon were false, or, at minimum, treated their truth as immaterial, focusing instead on Vassar's overriding objective of protecting Woods-DeLeon's reputation. By assuring Woods-DeLeon that any consideration of Jane Doe's allegations was merely a formality and not a genuine effort to assess or charge him with wrongdoing, AVP Guthrie signaled that Vassar had aligned itself with Woods-DeLeon before conducting any neutral or independent review.

### G. Vassar Begins Treating Protected Conduct, here, Speech, as "Harassment."

72.     On May 20, 2025, AVP Guthrie convened a second strategy meeting with Woods-DeLeon, Professor Woods, and Woods-DeLeon's father.

73.     AVP Guthrie reported back on Professor Woods' request that Vassar ask Fizz to perform searches using Woods-DeLeon's initials, class year, and other identifiers. AVP Guthrie asked Woods-DeLeon to supply more search terms and names and offered to run expanded searches herself.

74.     These actions occurred before any formal Title IX complaint was filed, and before any investigator had been assigned. Such investigative activity was not authorized at the intake stage under Vassar's Title IX policies and reflected the same conflict of interest evident at the first

14

meeting.

75.    AVP Guthrie then reported that she had already consulted Vassar's General Counsel about searching Fizz and obtaining identifying information. By coordinating legal strategy for one party prior to any formal Title IX complaint, AVP Guthrie continued acting as an institutional advocate for her colleague's son rather than a neutral administrator.

76.    AVP Guthrie asked Woods-DeLeon for additional terms to "search for," solicited his theories about who he believed was responsible for online posts, and even invited him to shape the scope of future investigative steps. AVP Guthrie indicated she would direct Vassar personnel to pursue these leads, reflecting a Woods-DeLeon-favored investigation rather than any independent assessment.

**Belinda Guthrie:**

Thank you for joining me this afternoon. I wanted to update you on the status of the College's e outreach to Fizz, the General Counsel's outreach to Fizz. The College did a search using your initials and class year and terms used in earlier posts to see if any responses that were posted previously remained visible or if they had all been removed, and if there were any new posts.

I wanted to ask you if there were any other terms you thought we should search for. For example, were there any posts that referenced your band's name or any other terms that we should use?

**SWD:**

Yeah. My initials are dropped in the chat. I don't know the last time I checked, but I remember that they just used my initials. They used SD 28.

**Belinda Guthrie:**

SD 28, okay.

**SWD:**

Yeah, I don't know. Did she go into the system and search or just use the app to search?

**Belinda Guthrie:**

She was only able to use the app. I understand that she did a search on SD, SWD, SW and a combination with your class year '28. She said that majority had been deleted but found some a couple of responses that hadn't been deleted even though the originating post was no longer visible, so those were flagged.

Sebastian, what are the names of your band? Is it just one band or do you have two bands?

**SWD:**

I'll just put it in the chat.

**Belinda Guthrie:**

Okay. Those are two band names? And, were any of those band names referenced in previous posts? Do you recall?

**SWD:**

Yeah, I mean, I'm pretty sure they all got taken down.

Page 1 of 11

SWDHD Evidence 000074



OFFICE FOR
INSTITUTIONAL EQUITY

**Belinda Guthrie:**

Okay.

**SWD:**

But yeah.

**Belinda Guthrie:**

All right. I'll have her run a search on those names as well. I'll also ask Ms. Humphrey, the general counsel, to also be aware of searches that might include your bands' names when she speaks with the Fizz administrator.

77.     Woods-DeLeon expressed concern regarding his conduct with the minor-aged student, stating, "my mother and I spoke to" Title VI Director Van Brunt, who acknowledged "the part about [Jane's being under]age" . . . was "not great" . . . "because she was a minor at the time." Asked how that fact "would affect the process," AVP Guthrie reassured Woods-DeLeon that Jane's report did not amount to sexual assault.[3] AVP Guthrie further assured Woods-DeLeon that touching a sixteen-year-old's thigh while attempting to kiss her "was not sexual in nature" and "would not fall under Vassar's sexual misconduct policies."

> **Belinda Guthrie:**
> When you say not good, can you say what you mean by that?
>
> **SWD:**
> Well, I'm kind of repeating back to what Mr. Van Brunt when my mother and I spoke to him. I mean, those are kind of his words. I mean, he was like, yeah, I mean the part about her age, it's not great because she was a minor at the time. You know what I mean?
>
> **Belinda Guthrie:**
> She still is a minor. The age of consent for sexual activity in New York state is 17 not under 17.
>
> **SWD:**
> 17.
>
> **Belinda Guthrie:**
> 18 is the age of being a legal adult. But in New York state, the age to give consent for any type of sexual activity is 17 and older. The allegations based on what you've shared and what she shared in her initial report is that there was no conduct that would be defined as sexual in nature. There was no allegation of fondling, there was no sexual assault allegation that would fall under the College's sexual misconduct policies. I don't have any information at this time that would, for example, that requires the College to notify the police.

78.     By discounting the minor victim's report and affirmatively deciding not to refer the matter to law enforcement, AVP Guthrie aligned herself with the Woods-DeLeon family's narrative and acted to protect Woods-DeLeon. In doing so, AVP Guthrie abandoned any appearance of neutrality. Her assurances further confirmed that Vassar had adopted the family's effort to reframe Plaintiff's protected speech as "harassment" and to pursue an adverse Title IX action against Plaintiff instead.

---

[3] Contrary to the New York Penal Law. *See generally*, N.Y. Penal Law §§ 130.52, 130.55 and 260.10(1).

***H. Vassar Initiates a Title IX Case Against Plaintiff and Jane Doe and Subjects Plaintiff to a Protracted Retaliatory Investigation.***

79.     On June 3, 2025, Vassar filed two Title IX complaints at Woods-DeLeon's request: one against Plaintiff and one against Jane Doe. Of course, Jane Doe is the same minor to whom Woods-DeLeon admitted placing his hand on her leg and attempting to kiss her. Notwithstanding those admissions, Vassar permitted Woods-DeLeon to initiate and pursue a Title IX complaint against Jane Doe.

80.     On June 19, 2025, Vassar separately served Plaintiff and Jane Doe with Notices of Investigation and Allegations (NOIA).

81.     In the NOIA against Plaintiff, Vassar alleged that, in the Spring 2025 semester, Plaintiff spread "untrue rumors" on Fizz that Woods-DeLeon had sexually assaulted other individuals.

82.     Vassar charged Plaintiff's speech as (1) Title IX hostile environment sexual harassment; (2) discriminatory harassment under its policy against discrimination ("on the basis of actual or perceived characteristic"); and (3) "disruptive conduct" under its community expectations policy.

***I. Vassar Deepens Its Conflicts of Interest by Assigning an Investigator from the Same Consulting Firm that Publicly Listed AVP Guthrie as a Consultant.***

83.     On June 3, 2025, Vassar retained AVP Guthrie's colleague, Mikiba Morehead, an investigator from TNG Consulting ("TNG"), a private firm that provides Title IX and civil-rights compliance services to colleges and universities.

84.     In the cover letter to Plaintiff accompanying the NOIA and charges, AVP Guthrie averred that the TNG investigator was "neutral."

85.     While Vassar engaged TNG to perform investigative functions in this matter, AVP Guthrie, the official responsible for classifying Plaintiff's conduct and initiating, directing, and

overseeing the Title IX process, *was herself publicly listed by TNG as one of its consultants*.[4] Accordingly, the same entity presented to Plaintiff as a "neutral" investigator simultaneously held out Vassar's chief Title IX official as one of its consultants, a role that AVP Guthrie has held since at least approximately 2012, creating an inherent and undisclosed conflict of interest.



_____

[4] https://www.tngconsulting.com/team/belinda-guthrie-m-a/

### J.  Vassar's Title IX Investigation Was Retaliatory, Biased, and Harmful to Plaintiff.

86.     During the Title IX investigation regarding Plaintiff, Vassar permitted Woods-DeLeon to elect informal resolution on three separate occasions, only for him to withdraw each time before the informal resolution process commenced and then reinstate formal disciplinary proceedings against Plaintiff without consequence. Upon information and belief, Woods-DeLeon, aware of the relationship between Plaintiff and Jane Doe, timed these reversals strategically to gain leverage in the parallel Title IX proceedings involving Jane Doe. Each time this tactic failed to produce his desired outcome in that parallel matter, Woods-DeLeon reverted to formal proceedings against Plaintiff, with Vassar's knowledge and acquiescence.

87.     During Jane Doe's interview in connection with the investigation of Plaintiff, Jane unequivocally stated that the Fizz posts were "not false rumors. I'm a real person and my assault really happened to me  I do feel like what is happening with [Plaintiff's] case is retaliation." She further explained: "After months of witnessing me struggling, hiding in my room, and avoiding the dining hall, I believe [Plaintiff] was trying to do what I had been asking Vassar to do for months. [Plaintiff] was attempting to stand up for me and support me."

88.     The Title IX investigation quickly became a profound source of stress for Plaintiff. He experienced and continues to experience escalating anxiety, humiliation, and fear about his academic standing and future opportunities. In June 2025, Plaintiff began psychotherapy to cope with the uncertainty and pressure of being prosecuted by his own school for conduct he believed, then and now, was truthful, protective, and the right thing to do. The stresses and uncertainty of Vassar's investigation have disrupted Plaintiff's daily functioning, strained his relationships, and cast a shadow over every aspect of his academic experience.

**K. *Plaintiff's Objections to Vassar Concerning Its Improper Use of Title IX Jurisdiction To Prosecute the Investigation, As Well as Bias and Conflicts of Interest.***

89. Beginning in September 2025 and for months thereafter to the present, Plaintiff has repeatedly urged Vassar to terminate this wrongful Title IX investigation and prosecution against him. The TNG Investigator's draft report issued in October 2025 confirmed that Woods-DeLeon's allegations against Plaintiff concerned only reputation-protection efforts, as opposed to any recognizable sex-based discrimination claims. Citing *Nungesser v. Columbia Univ.*, 169 F.Supp.3d 353 (S.D.N.Y. 2016), Plaintiff repeatedly advised Vassar that allegations involving reputational harm, such as being called a "rapist," or a sexual assaulter, do not constitute sex-based discrimination and cannot support Title IX jurisdiction.

90. *Nungesser* also found that a school's failure to respond to such speech cannot constitute deliberate indifference. *Id.*

91. Plaintiff also pointed out that this Title IX process has been tainted by bias, conflicts of interest, and jurisdictional defects, as heretofore pleaded.

92. Despite acknowledging these objections, Vassar refused to terminate the Title IX action or address the lack of Title IX jurisdiction and conflict-of-interest concerns. While the conflict issues were escalated to Vassar's Vice President of Operations for Technology and Human Resources, Chief Information Officer, as of the date of this Complaint, Vassar has failed to respond, even as Vassar continues to prosecute this matter well beyond its own established timelines.

**L. *The Final Investigation Report Confirms That Vassar's Proceedings Are Biased, Jurisdictionally Defective, and Plainly Targeted at Punishing Plaintiff for His Speech.***

93. On December 1, 2025, the TNG investigator ("Investigator") issued her final report for submission to a decision-maker.

94. The Investigator adopted Vassar's predetermined and erroneous jurisdictional

21

theory that Plaintiff's speech was actionable under Title IX, repeatedly asserting the Fizz posts were "sexual in nature."  However, statements with sex-based content alone do not establish sex-based harassment or Title IX jurisdiction. *Oncale v. Sundowner Offshore Servs*, Inc., 523 U.S. 75, 80 (1998) ("We have never held that . . . harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *Nungesser v. Columbia University*, 169 F. Supp. 3d 353, 364-67 (S.D.N.Y. 2016) (holding that being accused of sexual assault or labeled a "rapist," even falsely, is not sex-based harassment under Title IX, because such statements target conduct, not gender); *see also Roe v. St. John's Univ.,* 19-CV-4694, 2021 WL 1224895 (E.D.N.Y. 2021), *aff'd* 91 F.4th 643 (2d Cir. 2024) (same); *Doe v. Columbia Coll. Chicago*, 933 F.3d 849 (7th Cir. 2019) (same).

95.    Each Title IX allegation against Plaintiff required proof that Plaintiff targeted Woods-DeLeon because of a "protected characteristic." *Tassy v. Buttigieg*, 51 F.4th 521, 533 (2d Cir. 2022) ("hostile" "environment" claim requires proof of complainant's "membership in a protected class").  Yet the Investigator omitted that element entirely from the questions she framed for the decision-maker:

      a.  For Allegation 1 (Hostile Environment Sexual Harassment (Title IX)): "Did [Plaintiff] engage in the spreading of untrue rumors about [Woods-DeLeon] on the social media app Fizz during the Spring semester?"

      b.  Under Allegations 2 and 3 (Discriminatory Harassment and Hostile Environment, False Allegations and Evidence): the framing was identical.

96.    The Investigator recommended that the decision-maker "may" adopt Vassar's improper theory that any reference to sex constitutes sex-based harassment, asserting that:

      a.  because the posts referenced "sexual assault," they should be treated as "on the basis of sex."

      b.  "comments alleging that someone has engaged in sexual assault may constitute objectively offensive conduct"

97.    The Investigator repeated this misstatement under Allegation 2, recommending that

22

"on the basis of sex" can be satisfied simply because the post referenced sexual misconduct, an erroneous standard that mirrors Vassar's retaliatory effort to convert a reputational dispute into a Title IX case. Again, speech does not become sex-based harassment under Title IX simply because it references sexual conduct or sexual assault without a nexus to a person's sex-status. *See Oncale*, 523 U.S. at 80; *Nungesser*, 169 F. Supp. 3d at 364-67; *Roe*, 2021 WL 1224895, at \*19-21, *aff'd*, 91 F.4th 643; *Doe v. Columbia Coll. Chicago*, 933 F.3d 849.

98.    The Investigator advanced "Allegation #4" "Disruptive Conduct," asserting Plaintiff posted "untrue" statements about Woods-DeLeon on Fizz, framing, for the Decision-Maker, the "central question" as whether those "untrue" rumors "substantially interfered with [Woods-DeLeon's] educational environment or [were] *intended* to harm, coerce or intimidate [Woods-DeLeon]."

99.    The Investigator acknowledged that multiple individuals posted about Woods-DeLeon on Fizz, but deemed identifying other posters "irrelevant," despite offering no evidence that their conduct differed materially from Plaintiff's. This focus signaled that Vassar has targeted Plaintiff, and Plaintiff alone, for engaging in protected speech.

100.    The Investigator omitted critical evidence from Jane Doe's interview, including her statement that Vassar's actions against Plaintiff were retaliation for speaking about Woods-DeLeon's conduct.

101.    The Investigator recommended erroneous legal standards, asserting that "the policy does not require [Plaintiff's] comments to be true" to sustain a violation. That error treats Plaintiff's good-faith safety warnings about sexual misconduct as inherently actionable under Title IX regardless of their truth or reasonableness, effectively punishing protected conduct itself. To the contrary, under antiretaliation law, protected activity includes good-faith opposition to sexual misconduct even if the speaker is mistaken. *See Littlejohn v. City of New York*, 795 F.3d 297, 317

23

(2d Cir. 2015) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.,* 555 U.S. 271, 276 (2009)) (holding that protected activity includes "any activity designed 'to resist or antagonize. . .; to contend against; to confront; resist; [or] withstand'" prohibited discrimination).

102.    The Investigator designated both of Plaintiff's witnesses as exhibiting "bias" while declining to apply the same standard to Woods-DeLeon's witnesses.

103.    The Investigator submitted both the draft and final investigative reports to AVP Guthrie for "review" days before the parties received them. AVP Guthrie's pre-release supervisory review eliminated any pretense of neutrality and confirmed that the investigation was directed by the very administrator whose neutrality was already compromised.

### M.   Post-Hearing Determination and Discipline: The Final Determination Found No Title IX Liability but Nevertheless Found Plaintiff Responsible For "Disruptive Conduct" and Imposed Discipline.

104.    Following the disciplinary hearing, Vassar completed its Title IX hearing process and issued a written determination, through a Decision-Maker, on January 30, 2026.

105.    The Decision-Maker found Plaintiff not responsible for all Title IX charges and determined that Plaintiff's statements were not made "on the basis of sex;" not motivated by sex-based hostility, sex stereotyping or differential treatment on account of sex, and thus, did not constitute Title IX harassment; and Plaintiff did not make knowingly false accusations.

106.    The final determination which exonerated Plaintiff on all Title IX charges did not end Vassar's adverse action. Instead, Vassar has continued to punish Plaintiff for "Disruptive Conduct," a catchall, confirming that Vassar had targeted Plaintiff for his protected conduct from the start.

107.    The Decision-Maker credited that Plaintiff's speech was motivated by safety concerns and was intended to warn others.

108.    The Decision-Maker determined that a "broader rumor ecosystem existed" on

campus, including other allegations and anonymous posts circulating on Fizz, and that "authorship for many anonymous posts cannot be reliably attributed to [Plaintiff]."

109.    Despite the Decision-Maker rejecting Title IX liability in its entirety, Plaintiff was found responsible under a separate, internal provision, "Disruptive Conduct."

110.    Central to its determination was the Decision-Maker's conclusion that Plaintiff spoke out "outside of formal processes" and outside of "institutional channels," which Vassar adopted as the basis for discipline. In other words, Vassar conceded that it was punishing Plaintiff for speaking out.

111.    In its Investigative Report, Vassar defined the "central question" under "Disruptive Conduct" as whether Plaintiff's conduct "substantially interfered with [Woods-DeLeon's] educational environment or was *intended* to harm, coerce or intimidate."

112.    In its final determination, Vassar—through the Decision-Maker—altered the governing standard, newly defining that for "Disruptive Conduct" "intent is *not* required;" conduct is punishable if it "reasonably carries the appearance of seeking to harm or intimidate regardless of [Plaintiff's] asserted motive."  Thus, Vassar modified the requisite mental state in the same proceeding, shifting from one requiring intent to one based on reasonable foreseeability or an objective appearance.

113.    Additionally, in the Investigative report, the factual predicate for the "Disruptive Conduct" charge was whether Plaintiff posted "untrue" statements about Woods-DeLeon.

114.    In the final determination, Vassar altered the factual predicate for responsibility for "Disruptive Conduct."  The Decision-Maker stated it would not "adjudicate the truth or falsity" of the statements—and, thus, whether Plaintiff's statements were "untrue" was no longer dispositive, as Vassar had charged from the start. Vassar thereby treated truth as immaterial and found Plaintiff responsible based on the "manner, scope and context" of his "communication" and its "reasonably

25

foreseeable effects."

115. The Decision-Maker credited that Plaintiff acted from safety concerns, that his statements were not knowingly false, and that they were not sex-based harassment.

116. The Decision-Maker also found Plaintiff's statements occurred within a broader environment of campus "rumors" not attributable solely to Plaintiff.

117. Vassar's discipline included a "Warning Level 3 (Intervention)": a "formal, final warning" to Plaintiff that "any future failure" to meet "community expectations" or imposed sanctions will "likely" result in Plaintiff's temporary or permanent "removal" from Vassar or more severe sanctions. The sanctions remain in effect for the remainder of Plaintiff's time at Vassar.

118. Vassar also imposed other mandatory disciplinary measures.

### N. Vassar Disciplined Plaintiff Because He Spoke Publicly Rather Than Through Institutional Channels.

119. The Decision-Maker found Plaintiff responsible for "Disruptive Conduct" because he spoke publicly rather than confining his speech to Vassar's internal processes. Vassar adopted that finding and imposed discipline on that basis.

120. Ironically, however, those same internal processes had failed to act in response to Jane Doe's Title IX reports and actively discouraged her from contacting law enforcement.

121. Only months later, after Woods-DeLeon raised reputational concerns to the Title IX office, did Vassar finally initiate a formal investigation on Jane Doe's behalf while assuring Woods-DeLeon that it was "not designed intentionally just to bring charges against [him]."

122. At the same time, Vassar simultaneously brought Title IX proceedings on Woods-DeLeon's behalf against both Jane Doe and Plaintiff.

123. Vassar ultimately punished Plaintiff not for sex discrimination, sexual harassment, or falsehoods, but for communicating safety concerns "outside formal processes" after the internal

institutional channels failed to act on Jane Doe's reports for months.

124.    As applied to Plaintiff, the "Disruptive Conduct" charge penalized Plaintiff's warnings and the campus reaction to them, not any independent misconduct apart from his speech.

### O. The Discipline Confirms the Investigation Was Retaliatory

125.    Vassar initiated the Title IX proceeding alleging that Plaintiff's speech constituted sex-based harassment.

126.    The Decision-Maker rejected that theory.

127.    Vassar nevertheless imposed discipline under a generalized "Disruptive Conduct" provision based on the same speech and evidentiary record.

128.    Having failed to establish Title IX harassment, Vassar recharacterized Plaintiff's identical expressive conduct under a broader and altered standard to justify imposing punishment.

129.    The adverse action was the investigation, prosecution, and discipline arising from Plaintiff's protected speech.

### P. The Final Determination Shielded Conflicts of Interest from Scrutiny and Portrayed the Intake Process as Neutral

130.    In the final determination, the Decision-Maker denied Plaintiff's request to call AVP Guthrie as a witness, concluding no "material issue" required her testimony and that alleged conflicts of interest were "outside the proper scope of the hearing."

131.    That ruling prevented inquiry into AVP Guthrie's pre-complaint involvement in meetings with Woods-DeLeon and Professor Woods, despite Plaintiff's repeated and documented objections concerning bias and conflicts of interest.

132.    The determination nevertheless described a "neutral intake process," stating that *after* Woods-DeLeon filed a complaint on June 4, 2025, AVP Guthrie "reviewed" it, "determined" there was sufficient information to support policy violations, and issued a formal NOIA to Jane

Doe and Plaintiff.

133.    It further mischaracterized AVP Guthrie's role as "administrative" rather than involving "first-hand" participation in the underlying matter.

134.    However, months before Woods-DeLeon formally filed his complaint, AVP Guthrie engaged in meetings with him and Professor Woods; directed investigative activity; discussed strategy; identified potential respondents; and advised Woods-DeLeon on procedural options. AVP Guthrie helped shape the framing of the allegations later brought against Plaintiff.

135.    By excluding testimony about AVP Guthrie's pre-complaint involvement, while simultaneously portraying the intake process as neutral and her role as "administrative rather than first-hand," the final determination continues to insulate central conflicts of interest from scrutiny.

### Q. As A Result of This Conflict-Ridden, Prolonged, Retaliatory Investigation for Engaging in Protected Speech, Plaintiff Continues to Suffer Physical, Emotional, and Financial Harm.

136.    Since Vassar engaged in this retaliatory investigation, the Title IX process has been a profound source of anxiety for Plaintiff.

137.    As a result of Vassar's retaliatory actions, Plaintiff has suffered and continues to suffer psychological harm, including:

   a.  New mental health diagnoses, including adjustment disorder with mixed anxiety and depressed mood;

   b.  Anxiety;

   c.  Persistent Rumination: He devotes a considerable amount of time and energy contemplating the implications of this case on his education and future;

   d.  Increased difficulty concentrating;

   e.  Panic attacks;

   f.  Depression symptoms, including diminished energy and motivation, as well as a notable lack of enjoyment in previously pleasurable activities; and

g. Sleep disturbances.

138. This chronic stress has also impacted Plaintiff's physical health. He now suffers from gastrointestinal distress and a higher frequency of illness.

139. Vassar's retaliatory actions have also impaired and continue to impair Plaintiff's ability to fully participate in and benefit from his education.

140. As a further result of Vassar's retaliatory actions, Plaintiff experienced profound social isolation during the course of the Title IX proceedings. Prior to taking a medical leave as further described in Paragraph 144 of this Amended Complaint, Plaintiff spent most of his time in his dorm room, no longer regularly attended the gym, and generally withdrew from school-related social events and campus life. He likewise reduced contact with close friends and was deprived of meaningful aspects of the "college experience" that are permanent and irretrievable.

141. Vassar's retaliatory investigation also subjected Plaintiff to stigma and reputational harm within the campus community, further isolating him socially and compounding the emotional and psychological toll of the proceedings.

142. As a direct result of Vassar's retaliatory actions, Plaintiff has suffered severe emotional distress and has been materially impaired in his ability to concentrate on his coursework. Specifically, Plaintiff's academic performance has declined, including lower examination scores and overall grades. Indeed, during the semester in which these retaliatory proceedings unfolded, Plaintiff received a grade of D for the first time in his academic life.

143. The resulting academic strain forced Plaintiff to reduce his course load and academic credits below the minimum required for full-time enrollment and has disrupted his academic progression.

144. Vassar's actions also forced Plaintiff to take a medical leave for the Spring 2026 semester, an otherwise critical and formative period of his education, thereby removing him from

29

the academic and campus environment ordinarily available to Vassar students.

145. As a result, Plaintiff's ability to complete his degree on schedule with the class with which he originally matriculated has been adversely impacted, thereby delaying his anticipated entry into the professional workforce.

146. Because of that medical leave and the circumstances that precipitated it, including Woods-DeLeon's conduct toward Plaintiff prior to the medical leave, wherein Woods-DeLeon followed Plaintiff and his girlfriend through one of Vassar's dining halls in a manner that Plaintiff reasonably perceived as intimidating, and Vassar's failure to take any disciplinary or remedial action with respect to Woods-DeLeon's intimidating conduct, which caused Plaintiff to fear for his safety and exist in a state of hypervigilance that further inhibited his willingness and ability to engage in ordinary campus activities, Plaintiff has been deprived of the ability to participate fully in the academic and campus environment ordinarily available to Vassar students.

147. Plaintiff is therefore missing the opportunity to form relationships with fellow students, professors, alumni, and others on campus that ordinarily develop into an individual's professional and economic network throughout adulthood, particularly within Vassar's extensive and well-connected alumni community. Access to that network confers substantial long-term professional and economic benefits to Vassar students and graduates. Plaintiff is also being deprived of the full range of educational benefits and opportunities ordinarily available to Vassar students, including access to academic programs, campus activities, mentorship opportunities, internships, scholarships, study-abroad and experiential learning programs, and other institutional resources that contribute to students' academic, professional, and economic development. The deprivation of these opportunities during a critical and formative period of Plaintiff's education has caused and continues to cause substantial harm to Plaintiff's academic development, professional standing, earning potential, and long-term career trajectory. These losses are not

30

abstract or merely emotional; they represent concrete deprivations of economically valuable opportunities that would otherwise enhance Plaintiff's professional advancement and lifetime economic prospects.

148.    Plaintiff has incurred and continues to incur out-of-pocket expenses, including but not limited to attorneys' fees and medical bills, as a direct result of Vassar's retaliatory proceedings and related conduct. In addition, because Vassar's actions have delayed Plaintiff's anticipated graduation, he will be subject to Vassar's tuition increases, which upon information and belief recently rose by approximately 3.9%, thereby increasing the ultimate cost of his education.

149.    As a result of the sanctions, Plaintiff remains under the continuing threat of further discipline, including suspension or expulsion, under vague and shifting "community standards" that Vassar reinterpreted during the same proceeding in order to impose liability for protected speech.

150.    The ongoing sanctions and threat of escalated discipline under vague and shifting standards and factual predicates for "Disruptive Conduct" have compounded Plaintiff's existing anxiety, emotional distress, and academic strain, and have further impaired his equal access to educational benefits and opportunities. Indeed, Plaintiff now experiences heightened stress and apprehension when considering engaging in speech concerning campus safety or sexual misconduct, fearing that any such expression may again be reclassified as disciplinary conduct.

### R. *Prosecuting Plaintiff for Speaking Out About Sexual Assault Has Chilled Speech on Campus.*

151.    Upon information and belief, Vassar's decision to subject Plaintiff to a Title IX investigation for speaking about Woods-DeLeon's conduct has chilled speech on campus, as students now understand that discussing sexual misconduct, even as good faith efforts to warn other students, may be treated as defamation or sexual harassment and lead to Title IX charges.

152.    While pursuing this Title IX proceeding against Plaintiff, Vassar, through Dean Luis Inoa, who upon information and belief was involved in matters related to this retaliatory investigation and its aftermath, circulated a campus-wide email on both May 20, 2025, and December 5, 2025, explicitly addressing anonymous online speech on platforms such as Fizz. Those emails warned that posts discussing specific individuals could violate student conduct policies and expose students to disciplinary and legal consequences. The messages closely tracked the factual basis of this case and unmistakably signaled that speech like Plaintiff's could trigger institutional punishment.

### S. Vassar's Adverse Actions Towards Plaintiff Have Breached Specific Policies and Contractual Commitments.

153.    Vassar sets forth specific policies governing its disciplinary procedures, including its Title IX policy, "Resolution Process," Antidiscrimination Policy, Student Bill of Rights, and related resolutions procedures. These policies form part of the contractual relationship between Vassar and its students. Vassar's policies specify mandatory commitments concerning timeliness, impartiality, conflicts of interest, retaliation and properly classifying and resolving reported misconduct.

154.    Vassar's policies define "Disruptive Conduct," using articulated criteria that provide students notice of what conduct is prohibited and the mental state required for a violation.

155.    Vassar promises to classify reported conduct under the correct policy and to use its Title IX procedures only when allegations meet Title IX's definitions.

156.    Conduct that falls outside of Title IX scope must be handled under alternative Vassar policies, *not the Title IX process*.

157.    Vassar's policies further promise that disciplinary proceedings will:

   a.   comply with the most recent government laws, regulations, or court holdings.

   b.   Include an initial assessment within three to five business days and conclude investigations within 30 to 60 business days, and the entire process within 60

to 90 business days.

c.   Investigate and adjudicate claims free from conflicts of interest and bias.

d.   Vet investigators or decision makers for impartiality; and

e.   Remedy any bias and concerns raised.

158.   Vassar expressly prohibits "materially adverse actions" against individuals who report or oppose misconduct in good faith. Retaliation includes the misuse of disciplinary processes because of a student's protected activity.

159.   Vassar's policies provide that students exercising rights, including speech and expression, will not be subject to retaliation.

160.   Vassar promises not to retaliate against students for supporting other students undergoing the process.

161.   In the final investigation and adjudication of Plaintiff's case, however, after abandoning its Title IX claims, Vassar altered the governing definition of "Disruptive Conduct," from one that considered whether Plaintiff "intended to harm, coerce or intimidate" Woods-DeLeon, to one where, *inter alia*, "intent is not required."

**COUNTS I to VI**
**COUNTS FOR RELIEF**

**COUNT I**
**Violation of Title IX, Retaliation**
**20 U.S.C. § 1681, *et seq***

162.   Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

163.   Vassar receives and at all relevant times has received financial assistance and is therefore subject to Title IX and its implementing regulations.

164.   Title IX prohibits schools receiving federal funds from retaliating against any

33

person who engages in protected activity, including opposing sex discrimination, reporting, or supporting reports of sexual misconduct or speaking out about sexual assault. *See Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005).

165.    Plaintiff engaged in protected activity under Title IX by speaking out about sexual assault or misconduct toward a minor student, expressing support for a fellow student who suffered from the misconduct, and warning others in good faith about conduct he reasonably believed constituted sexual assault or sexual misconduct under state and federal definitions.

166.    Under Title IX, protected activity is not limited to formal reporting. Informal speech, expressive conduct, and warnings among peers about sexual misconduct or safety concerns are equally protected by Title IX's antiretaliation provisions.

167.    Plaintiff's statements were reasonable, good faith warnings about sexual misconduct based on conversations with Jane Doe, not "untrue rumors" as Vassar repeatedly and inaccurately described them.

168.    In communications with Vassar, Woods-DeLeon admitted to placing his hand on the thigh of a 16-year-old minor student without her consent while attempting to kiss her. Such conduct reasonably constitutes forcible touching and third-degree sexual abuse under N.Y. Penal Law §§130.52 and 130.55.  Both are classified as sex offenses under Article 130 of the New York Penal Law. Woods-DeLeon's conduct also reasonably qualifies as endangering the welfare of a child under N.Y. Penal Law § 260.10(1).

169.    Upon information and belief, Woods-DeLeon also engaged in similar nonconsensual conduct toward another female student, Jane Doe II, by placing his hands on her buttocks. That reasonably constitutes forcible touching and third-degree sexual abuse under N.Y. Penal Law §§ 130.52 and 130.55.

170.    Forcible touching and third-degree sexual abuse are sex offenses under New York

34

law and qualify as "sexual assault" within the meaning of Vassar's own policies, which are premised on local, state, and federal laws, and generally accepted federal interpretations.

171.    Nonconsensual sexualized touching of the buttocks constitutes "fondling" under federal Clery/VAWA definitions.

172.    Plaintiff's warnings, using ordinary speech, that Woods-DeLeon had "SA-ed" or "sexually assaulted" another was substantially true or at the very least was a reasonable good-faith characterization of conduct that is criminal in New York.

173.    Plaintiff's intent was to protect other students from the risk of similar misconduct and to call attention to behavior he reasonably believed was boundary-crossing sexualized behavior.

174.    Vassar initiated a Title IX investigation against Plaintiff, characterizing his speech as rumors or untrue statements about Woods-DeLeon.

175.    As a matter of law, reputational concerns do not convert peer speech into sex-based harassment under Title IX.

176.    Under *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364-67 (S.D.N.Y. 2016), accusations that a student committed sexual assault, even if referenced and repeated by other students, do not constitute "sex-based harassment." The law is clear that reputational harm arising from allegations of sexual misconduct does *not* give rise to Title IX liability, nor does a school's failure to silence such good faith speech constitute deliberate indifference.

177.    Motivated by AVP Guthrie's alignment with Woods-DeLeon and her colleague, Professor Woods, Vassar chose to prosecute Plaintiff under Title IX, even though Woods-DeLeon never alleged that Plaintiff's statements targeted him *because of his sex*. Vassar's actions were wholly discretionary, not compelled by Title IX, and reflected a retaliatory misuse and abuse of Title IX to resolve a reputational dispute and to protect the reputation of a Vassar faculty member's

35

child.

178.    Instead of conducting a neutral inquiry, Vassar pursued a Title IX action against Plaintiff riddled with conflicts of interest and pre-complaint investigative actions for Woods-DeLeon's benefit, strategic guidance from the Title IX office, and advocacy pursued by a longstanding faculty member on her son's behalf.  The very initiation of this Title IX investigation was an adverse action in response to Plaintiff's protected conduct.

179.    The Investigator's final report—which omitted any "protected characteristic" analysis, recommended that the Decision-Maker treat any sexual subject matter as "sex-based" and excluded evidence favorable to Plaintiff—confirmed the retaliatory nature of the Title IX action, particularly given AVP Guthrie's relationship with the Investigator and the Investigator's employer, TNG. Vassar's actions would deter a reasonable student from speaking out about sexual misconduct or warning peers. This is not speculative. While pursuing this Title IX proceeding against Plaintiff, Vassar, through Dean Luis Inoa, who upon information and belief was involved in matters related to this retaliatory investigation and its aftermath, circulated a campus-wide email on both May 20, 2025, and December 5, 2025, explicitly addressing anonymous online speech on platforms such as Fizz. Those emails warned that posts discussing specific individuals could violate student conduct policies and expose students to disciplinary and legal consequences. The messages closely tracked the factual basis of this case and unmistakably signaled that speech like Plaintiff's could trigger institutional punishment. A reasonable student would understand those messages, particularly in light of what Plaintiff has endured through Vassar's Title IX process, as a warning: speaking out, even truthfully and for safety-related reasons, may result in investigation, discipline, and reputational harm. Such conduct would dissuade any reasonable person from engaging in protected activity.

180.    A reasonable student would be deterred from speaking about sexual misconduct if doing so risked initiating a protracted Title IX investigation and prosecution.

181.    The Decision-Maker ultimately found Plaintiff not responsible for any sex-based

harassment or any violation under Title IX.

182. Nevertheless, Vassar disciplined Plaintiff based on the same speech, factual allegations, and asserted harm.

183. Plaintiff engaged in no additional conduct after his protected speech. Vassar's discipline rested entirely on that speech.

184. Vassar justified discipline on the ground that Plaintiff spoke publicly rather than exclusively through institutional channels, despite those channels' failure to address Jane Doe's complaints, thereby precipitating Plaintiff's speech.

185. After the Title IX theory failed, Vassar relied on a "Disruptive Conduct" provision and broadened the governing standard, eliminating the intent requirement and substituting a "reasonable appearance" standard, to impose punishment for the same speech.

186. Vassar also shifted the factual predicate for "Disruptive Conduct" from whether Plaintiff spread "untrue" rumors to the "context" of his communications and their "reasonably foreseeable effects," rendering the truth or falsity of the statements non-dispositive.

187. By changing the legal and factual predicates for "Disruptive Conduct" during the same proceeding, Vassar found Plaintiff responsible for the same speech under revised standards after failing to establish Title IX violations.

188. Vassar imposed formal discipline, including a Level 3 Warning and ongoing sanctions lasting the remainder of Plaintiff's enrollment.

189. Vassar's discipline subjects Plaintiff to the continuing threat of suspension or expulsion and would deter a reasonable student from engaging in similar speech concerning sexual misconduct and campus safety.

190. The investigation, prosecution and discipline were adverse actions taken because Plaintiff engaged in protected activity.

191.    Vassar's actions were retaliatory and would not have occurred absent Plaintiff's speech.

192.    As a direct and proximate result of Vassar's Title IX retaliation, Plaintiff has suffered damages, including but not limited to medical and counseling expenses, legal fees, emotional distress, humiliation, anxiety, physical and mental suffering, and academic harm, including interruption of his credit load and impaired educational access.

193.    Vassar's deliberate misuse of its investigative machinery, targeting and punishing a student engaged in protected conduct, demonstrates wanton or willful disregard, or at a minimum reckless indifference, to Plaintiff's protected rights and warrants an award of damages to the fullest extent under the law.

194.    Plaintiff is entitled to all damages available under Title IX.

### COUNT II
### Retaliation in Violation of New York State Human Rights Law, N.Y. Executive Law §296(7)

195.    Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

196.    Plaintiff also adopts and incorporates by reference herein each and every allegation pleaded under Count I.

197.    The New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296(7), prohibits retaliation against any individual who opposes practices forbidden under the statute, including sexual harassment, sexual violence, or discriminatory treatment based on sex. It also protects students who raise concerns, support complainants, or warn others in good faith about sexual misconduct.

198.    Plaintiff engaged in protected activity under the NYSHRL when he warned members of the campus community about conduct involving sexual misconduct toward a minor

and another student. His warnings were based on firsthand information that Woods-DeLeon had engaged in nonconsensual physical contact with a 16-year-old.

199.    Plaintiff likewise acted in good faith based on information that Woods-DeLeon had engaged in nonconsensual touching of a second female student, Jane Doe II.

200.    Plaintiff opposed conduct he reasonably believed constituted sexual misconduct, supported another student who experienced such conduct, and warned others to protect campus safety.

201.    In response to Plaintiff's speech and protected activity, Vassar initiated and pursued an improperly classified and biased Title IX proceeding. Vassar prolonged the process, ignored Plaintiff's objections regarding conflicts of interest and improper Title IX jurisdiction, and relied on administrators with ties to the Woods-DeLeon family to shield a faculty member's son while punishing Plaintiff for speaking out.

202.    Vassar chose to prosecute this investigation against Plaintiff after adopting the framing of Woods-DeLeon and his parents, disregarding its jurisdictional limits, and minimizing Woods-DeLeon's conduct, including reassuring him that touching a minor's thigh while attempting to kiss her "was not sexual in nature" and "would not fall under" Vassar's sexual misconduct policies, all while characterizing Plaintiff's truthful warnings as "sexual harassment."

203.    Even after abandoning its Title IX sexual harassment theory, Vassar has subjected Plaintiff to discipline because of his protected activity, finding he committed "Disruptive Conduct," premised on the same conduct underlying its now failed Title IX claims.

204.    Vassar's conduct would deter a reasonable student from warning others about sexual misconduct or publicly supporting a victim on campus if doing so exposed them to an extended, biased disciplinary process, or discipline in general.

205.    As a direct and proximate result of Vassar's actions, Plaintiff has suffered and

continues to suffer damages, including but not limited to medical and counseling expenses, legal fees, emotional distress, humiliation, anxiety, physical and mental suffering, and academic harm, including interruption of his credit load and impaired access to educational benefits and opportunities.

206. Vassar's deliberate misuse of its investigative machinery to protect a faculty member's son, while targeting and punishing a student engaged in protected conduct demonstrates wanton or willful disregard, or at a minimum reckless indifference, to Plaintiff's protected rights and warrants an award of damages to the fullest extent under the NYSHRL.

## COUNT III
### Breach of Contract

207. Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

208. Plaintiff applied to and enrolled in Vassar and has paid associated fees and expenses.

209. Plaintiff did so in reliance on the understanding and with the reasonable expectation that Vassar would implement and enforce the provisions and policies set forth in its official publications, including the Policy Against Discrimination and Harassment, the Title IX Sexual Harassment Policy, the EOAA Resolution Procedures, the Student Handbook, and all written assurances that disciplinary matters will be handled impartially, free of conflicts, and in accordance with governing law.

210. Vassar's published policies constitute contractual commitments governing the circumstances under which a student may be found responsible for misconduct and the standards to be applied in determining responsibility.

211. An express contract or, alternatively, a contract implied in law or in fact was formed

40

between Plaintiff and Vassar.

212.    The contract contained an implied covenant of good faith and fair dealing. That covenant guaranteed that any disciplinary proceedings would be conducted in good faith, consistent with Vassar's policies, and within the jurisdictional limits of Title IX, and not used as a pretext to investigate or punish conduct that falls outside Title IX's scope, including alleged conduct that does not constitute sex-based discrimination or harassment.

213.    Based on the aforementioned facts and circumstances, Vassar breached express and/or implied agreements with Plaintiff, and the covenant of good faith and fair dealing contained therein. Vassar's departure was arbitrary, irrational, and undertaken in bad faith.

214.    Vassar committed several breaches of its agreements by:

   a.   misclassifying a non-Title IX matter as falling under the scope of Title IX;

   b.   allowing administrators with personal and professional ties to the complainant's family to direct the process;

   c.   engaging in investigative activity before a Title IX complaint even existed;

   d.   failing to remain neutral;

   e.   retaliating against Plaintiff by subjecting him to a protracted Title IX investigation and action;

   f.   omitting Plaintiff's objections from investigative materials;

   g.   applying policies inconsistently; and

   h.   failing to resolve the matter promptly and fairly.

215.    Vassar's disciplinary policies promise that allegations of misconduct will be properly classified and adjudicated under the applicable framework and in good faith. After the Title IX allegations failed, Vassar determined responsibility and imposed discipline under the vague "Disruptive Conduct" provision based on Plaintiff's same underlying speech.

216.    During the investigation and adjudication of Plaintiff's case, however, Vassar

41

altered the governing definition of "Disruptive Conduct." The investigative report framed the legal issue as whether Plaintiff substantially interfered with Woods-DeLeon's educational attainment or "intended to harm, coerce, or intimidate." In its final determination, however, Vassar abandoned that standard and instead held that intent was "not required," and that Plaintiff could be found responsible if his conduct merely "reasonably carried the appearance" of harm or intimidation.

217. Vassar modified its standards to find Plaintiff responsible for "Disruptive Conduct," replacing a defined mental state requirement in its Investigative report with a vague and subjective foreseeability standard in its final determination. In doing so, Vassar departed from its promised standards, rendered the classification provisions meaningless, and constituted arbitrary and bad faith enforcement of its policies.

218. Vassar also shifted the factual predicate for finding Plaintiff responsible for "Disruptive Conduct" from allegedly spreading "untrue" rumors to the broader and undefined "context" of his communications and their "reasonably foreseeable effects."

219. Vassar breached its duty of good faith and fair dealing by altering the standards and factual predicates for "Disruptive Conduct" at the eleventh hour, in its final determination, to its own benefit and Plaintiff's detriment.

220. Vassar's finding of responsibility and resulting sanctions were possible only because of this altered standard; under the articulated policy standard, Plaintiff's speech, which was credited as safety-motivated and not knowingly false, would not constitute Disruptive Conduct.

## COUNT IV
### Promissory Estoppel
### (Alternative to Count III)

221. Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

42

222.    In the alternative to the breach of contract count, Plaintiff alleges that Vassar made clear and definite promises regarding (1) impartial and unbiased Title IX proceedings; (2) assigning administrators and investigators free of bias and conflicts; (3) properly classifying and using Title IX procedures only when jurisdictional requirements were met; (4) promptly and fairly resolving complaints; (5) promising not to retaliate against students for raising good faith concerns about sexual misconduct and  supporting victims being subjected to the process.

223.    Vassar made these promises in its published Title IX policies, procedural statements, training materials, and repeated assurances by Vassar administrators that the process would be neutral, conflict-free, and compliant with governing law.

224.    Plaintiff reasonably relied on these promises by speaking out in good faith to warn his fellow students and protect campus safety, participating in Vassar's disciplinary process, responding to requests for information, and submitting objections concerning jurisdiction, conflicts of interest, and procedural fairness.

225.    Vassar failed to uphold these promises by initiating and continuing a Title IX proceeding that did not fall within Title IX's jurisdiction; allowing administrators with personal and professional ties to Woods-DeLeon's family to direct and influence the process; omitting Plaintiff's objections in investigative materials being delivered to the decision maker; minimizing Woods-DeLeon's own conduct toward a minor; and prolonging a biased and structurally compromised investigation.

226.    Plaintiff's reliance on Vassar's promises was foreseeable, reasonable, and to his detriment. He suffered and continues to suffer emotional distress, academic disruption, loss of access to educational benefits and opportunities, and other harms as a result of Vassar's failure to adhere to its commitments.

227.    Vassar's promises must be enforced, providing Plaintiff equitable and legal relief.

**COUNT V**
**Declaratory Judgment,**
**28 U.S.C. § 2201**

228.    Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

229.    An actual and substantial controversy exists between Plaintiff and Vassar regarding the legality of Vassar's use of Title IX's procedures against Plaintiff, its misclassification of Plaintiff's protected speech as sexual harassment, and its retaliatory discipline imposed thereafter, and its failure to comply with its contractual and statutory obligations.

230.    Title IX prohibits discrimination *because of sex*, not discrimination or hostility arising from sexual conduct or sexual subject matter. Allegations, statements, or reputational harm tied to a sexual incident or even being called a "rapist" target conduct, not status, and, thus, do not constitute sex-based discrimination. *See Nungesser v. Columbia University*, 169 F. Supp. 3d 353, 364-67 (S.D.N.Y. 2016); *see also Roe v. St. John's University,* 19-CV-4694, 2021 WL 1224895 (E.D.N.Y. 2021), *aff'd* 91 F.4th 643 (2d Cir. 2024) (same); *Doe v. Columbia Coll. Chicago*, 933 F.3d 849 (7th Cir. 2019) (same).

231.    Vassar ultimately found Plaintiff not responsible for any sex-based misconduct but nevertheless imposed discipline based on the same speech under a "Disruptive Conduct" theory.

232.    The disciplinary record and sanctions remain in effect and continue to impose present and future adverse consequences on Plaintiff, creating a continuing legal harm, and requiring prospective relief.

233.    Plaintiff's warnings about sexual misconduct constituted protected activity under Title IX and Vassar's own anti-retaliation policies, as well as principles of academic freedom and free expression.

234.    Vassar's protracted Title IX investigation and resulting discipline—pursued at the

44

direction of the AVP/Title IX Coordinator, marred by conflicts of interest and bias in favor of the son of a Vassar Professor; unremedied by the appointment of an Investigator from the same firm associated with the AVP in this case; and ultimately resulting in exoneration on the Title IX charges but responsibility under a vague and amorphous conduct provision—were retaliatory and lacked Title IX jurisdiction.

235. Because the disciplinary finding rests on the same protected conduct, its continued enforcement constitutes an ongoing violation of Plaintiff's rights.

236. Plaintiff therefore seeks a declaration under 28 U.S.C. § 2201 that:

   a. Plaintiff's speech and warnings regarding sexual misconduct constituted protected activity under Title IX;

   b. Vassar's Title IX investigation, prosecution, and discipline of Plaintiff are unlawful, retaliatory, and undertaken without Title IX jurisdiction;

   c. Vassar violated its contractual and statutory obligations in initiating and pursuing this proceeding;

   d. Vassar's finding of responsibility and imposing discipline for "Disruptive Conduct," premised on the same protected conduct, constitutes retaliation under Title IX, and is invalid and unenforceable; and

   e. Vassar may not rely or give effect to that determination in any present or future disciplinary, academic, or reporting context.

**COUNT VI**
**Injunctive Relief**
**(Permanent)**

237. Plaintiff realleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

238. A live controversy exists between Plaintiff and Vassar regarding the legality, jurisdiction, and impartiality of the Title IX proceeding initiated against Plaintiff and the discipline imposed as a result of that proceeding. The process was improperly classified as a Title IX proceeding, riddled with conflicts of interest, and retaliatory.

239.    Title IX does not require schools to investigate or discipline students who, in good faith, warn others about sexual misconduct. Nor did Title IX or Vassar's own policies obligate Vassar to deploy its Title IX machinery to punish a student for speaking out about sexual misconduct, particularly where Vassar initially declined to act on behalf of a minor student but later mobilized that same machinery out of reputational concern for a faculty member's son. Vassar's decision to do so was not a matter of legal necessity. It was a matter of retaliation.

240.    *Nungesser v. Columbia*, 169 F. Supp. 3d 353, 364-67 (S.D.N.Y. 2016), makes clear that a student being publicly accused of sexual assault does not constitute sex-based discrimination. A school's refusal to silence such criticism, as here, based on a good faith belief in the truth of such allegations, does not constitute deliberate indifference to that student.

241.    Plaintiff has suffered and continues to suffer from Vassar's conflict-ridden, protracted investigation and resulting disciplinary findings, causing substantial emotional distress, loss of sleep, academic disruption, deterioration of mental health, loss of access to educational benefits and opportunities, and harm to his educational and professional future. Courts recognize that students subjected to biased or defective disciplinary processes suffer irreparable harm warranting injunctive intervention.

242.    Monetary damages alone cannot remedy the ongoing harm because the disciplinary record and sanctions continue to affect Plaintiff's educational trajectory, reputation, and future opportunities, including graduate school and professional licensure reporting obligations.

243.    The balance of equities favors relief because vacating a procedurally defective and retaliatory disciplinary outcome imposes no cognizable harm on Vassar, while allowing the determination to stand continues to injure Plaintiff.

244.    The public interest supports injunctive relief. Ensuring that educational institutions conduct Title IX proceedings free of retaliation, conflicts of interest, and jurisdictional overreach

serves the public interest in fairness, due process, and the proper functioning of educational environments.

245.   Plaintiff is entitled to a permanent injunction requiring Vassar to vacate and expunge all findings, records, and references arising from the retaliatory Title IX proceeding and related disciplinary determination.

246.   Plaintiff is further entitled to a permanent injunction prohibiting Vassar from relying upon, enforcing, or giving any present or future effect to those findings or sanctions and from initiating future proceedings based on the same protected speech.

**WHEREFORE**, Plaintiff respectfully requests judgment in his favor and against Defendant Vassar College, and that the Court award the following relief.

a.   A permanent injunction enjoining Vassar from continuing or reinstating the Title IX proceeding at issue and ordering the expungement of all references to the Title IX investigation, allegations, and related materials from Plaintiff's educational records;

b.   A declaratory judgment that Vassar violated Title IX and the New York State Human Rights Law by retaliating against Plaintiff for engaging in protected activity, and that Vassar breached and/or failed to honor its contractual obligations;

c.   Compensatory damages in an amount to be determined at trial for the emotional distress, mental anguish, academic disruption, loss of access to educational benefits and opportunities, and other injuries Plaintiff has sustained and continues to sustain as a result of Vassar's unlawful conduct;

d.   All damages available under federal and state law, including compensatory and where permitted, punitive damages for Vassar's willful, wanton, or reckless disregard of Plaintiff's protected rights;

e.   Attorneys' fees and costs to the fullest extent permitted by Title IX, the NYSHRL, and other applicable law;

f.   Pre-and-post-judgment interest as allowed by law; and

g.   Such other and further relief as the Court deems just, equitable, and appropriate.

Dated: New York, New York
       March 6, 2026

                                    Respectfully submitted,

                                    *Phillip C. Hamilton*

                                    Phillip C. Hamilton, Esq.
                                    Managing Partner
                                    Hamilton Clarke, LLP
                                    48 Wall Street, Suite 1100
                                    New York, New York 10005
                                    (T)  212-729-0952
                                    Hamilton@HCLLPLaw.com

                                    *Attorney for Plaintiff Hudson Double*

48